UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**LEIGH A. BEAUCHAMP,**

Plaintiff,

vs.

Case No. 20-cv

Hon.

**PROQUEST, LLC**,

Mag.

Defendant.

_____

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/Fax (248) 258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

_____

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Leigh A. Beauchamp, by her attorneys Deborah Gordon Law**,**

complain against Defendant as follows:

### Jurisdiction and Parties

1.     This is an action for gender discrimination and retaliation in violation

of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et*

*seq.*, and the Elliot-Larsen Civil Rights Act, M.C.L. § 37.201, *et seq.,* arising out of

Plaintiff's employment relationship with Defendant.

2.      Plaintiff Leigh A. Beauchamp is a resident of Michigan and resides in the Eastern District of Michigan.

3.      Defendant ProQuest, LLC, is a Michigan corporation that maintains its principal place of business and conducts business in the Eastern District of Michigan.

4.      The events underlying this Complaint occurred in the Eastern District of Michigan.

5.      This Court has federal subject matter jurisdiction pursuant to 28 USC § 1331, 28 USC § 1343, 28 USC § 1367.

6.      Pursuant to 28 USC § 1391, venue is proper in this Court.

**Factual Allegations**

7.      ProQuest is an information-content and technology company that provides applications and products for libraries.  Plaintiff began working at ProQuest in April of 2016 as Director of Global Technology and Content Operations.

8.      In 2018, Plaintiff was promoted to Vice President of Product Management, where she was largely focused on the development and sales of eBooks.

9.      Plaintiff, who holds a bachelor's and juris doctorate degree, was highly qualified for both roles, and at all times her performance was satisfactory or better.

2

10.     In 2016, Plaintiff won the "Making a World of Difference" award for increasing productivity in her department, including generating savings for the organization of more than $14 million dollars; in 2018 she won the Charleston Library Conference "Reader's Choice" award for expanding online access to eBooks; and from 2018-2020, she achieved growth in both eBook subscriptions and overall eBook platform usage.  All of these accolades were clear measures of success and indictors of Plaintiff's value to ProQuest.

11.     Plaintiff has always received favorable performance reviews, many of which indicated that Plaintiff "exceeds expectations."

12.     In addition to her responsibilities as Vice President, Plaintiff became a lead for the Global Enterprise Women's Network, a sub-organization within ProQuest that was created by female employees to connect women in the company. The organization was created in part due to the disproportionately few leadership roles women held at ProQuest.

13.     In this role, Plaintiff promoted and advanced women throughout the company by organizing events, conducting speaking arrangements, and mentoring other women. As such, Plaintiff worked closely with women in the company and was privy to female employees' concerns.  These concerns included unfair treatment in the workplace based on gender, and in particular, disparities in pay as compared to similarly situated male employees.

14.    As a Vice President of Product Management, Plaintiff managed an all-female team of ten employees.  Many of these employees communicated similar concerns to Plaintiff.

15.    In May 2019, Plaintiff brought these concerns, including unequal pay and disparate treatment, to the attention of the Human Resources Department. She was told that there was no pay disparity between men and women at the company.

16.    Plaintiff asked Human Resources to send out a high-level report to employees, without giving confidential information, that would confirm there was no disparity in pay. Plaintiff believed, and explained to Human Resources, that such a report would greatly increase morale in the company from the female employees. Human Resources refused to produce any such report or to provide any information.

17.    ProQuest maintained a male-dominated work environment, which fostered a culture of gender discrimination.

18.    For example, when Plaintiff was promoted to Vice President in 2018, one employee asked Plaintiff "who did you have to sleep to with to get that promotion?" Another employee said Plaintiff "[did] not seem like a Vice President."

19.    Leadership positions at ProQuest are heavily male-dominated, even though the general workforce at ProQuest is made up of roughly half men and half women.

20.    The executive team (the CEO, CTO, CFO, and CSO) is comprised of all men.

21.    Even after Plaintiff was promoted to Vice President, ProQuest would not allow her to move into a Vice President, placing her instead in a window-less supplies cabinet. Finally, after one year, she was able to move into a Vice President office.  ProQuest also declined to give her an underground parking spot, a benefit that male Vice Presidents enjoyed.

22.    Business meetings were male-dominated. Even when female employees were presenting during meetings, they were overlooked. Questions would be directed to a male in leadership as opposed to the female presenter who was more knowledgeable. This occurred regularly with regard to Plaintiff's team.

23.    Plaintiff complained to her direct supervisor, Jose "Pep" Carrera, about the poor treatment of women in meetings. Specifically, she told him that men do 80% of the talking and that female presenters are marginalized, including Plaintiff's team. Carrera responded that that was just the way it was.

24.     Between September 2019 and January 2020, Plaintiff had several similar conversations with Carrera about the poor treatment of female employees. She did not get a meaningful response, and nothing changed within the company.

25.    Plaintiff also complained to her Human Resources partner that gender was a factor in how she and her team were treated. Her Human Resources partner

agreed that there were issues based on gender within the company. Instead of addressing the issues, the Human Resources partner referred Plaintiff back to Carrera.

26.     Over the course of the two years leading to her termination, Plaintiff complained about disparities in treatment based on gender approximately fifteen different times. Nothing changed.

27.     In November 2019, before a new product launch, Plaintiff and her all-female team were cut off from communicating with clients, a key part of the team's work.

28.     Plaintiff scheduled a meeting to discuss why her team was not allowed to speak to clients. In that meeting, the Head of Sales told Plaintiff that she and her team did not have the right "skills" to speak to clients. In particular, he said Plaintiff and her team need to be "more forceful" in their communication and he was critical that Plaintiff and her team listened more than they talked to clients. Plaintiff was not given a reason why being "more forceful" or talking more than listening was the proper way to handle client calls.

29.     There was no foundation whatsoever to accuse Plaintiff and her team of not having the requisite skills to speak to clients.  In fact, Plaintiff had received ample positive feedback directed to her and her team about their ability to engage well with clients.

30.     Plaintiff and her team were the only product management team that was all female, and the only product management team that was prevented from directly interacting with customers. The other, mostly male, product teams were able to do so freely.

31.     In January 2020, Plaintiff reported the "skills" comment to her Human Resources partner. The Human Resources partner encouraged Plaintiff to discuss the comment with Carrera.

32.     Plaintiff did so the next day in a meeting with Carrera. In response, Carrera told Plaintiff that it was "time to talk about an exit strategy" and that Plaintiff was not the "right fit" for the position. He said he planned to make an announcement the following week that Plaintiff would no longer be a Vice President at ProQuest.

33.     In the same meeting, Carrera told Plaintiff she was an A+ employee who was very smart, the hardest-working employee in the department, and that he would be a reference for her. He encouraged her to find another role at ProQuest, and told her she should meet with Human Resources to begin that process.

34.     Shocked, but hoping to keep a job, Plaintiff arranged a meeting with her Human Resources partner that same day. She also sent communication out to various leaders at the company to see if there were any openings she could slot into.

35.     Plaintiff went to one male executive to discuss her options at the company given her treatment based on gender. He told her that it is "tough to get

7

ahead" at ProQuest and he brought up another female Vice President who had recently left the company and was now "doing great", suggesting Plaintiff would need to leave the company if she wanted to move up in her career.

36.     Plaintiff was able to locate one job opening on her own, Information Privacy and Protection Manager. Interviews were underway for this role, and her Human Resources partner, as well as the head of Global Human Resources, encouraged Plaintiff to apply. Plaintiff was very well qualified for this position.

37.     The hiring committee led Plaintiff to believe that she was going to get the job. Instead, Human Resources informed her she would not be given the role because there was too much "water under the bridge" with her at ProQuest. For that same reason, she would not be considered for any other position at ProQuest, and therefore would be terminated.

38.     On January 17, 2020, Plaintiff received a termination letter. Shortly thereafter, Carrera notified the company of Plaintiff's departure. He said of Plaintiff, via email:

> "Leigh has been a key contributor to the success of many important initiatives at ProQuest.  In her first two years with ProQuest, as Director in Content Operations, Leigh led a team of 60 acquiring and building content, while generating savings for the organization of more than $14M. In her 20 months with the Books business unit, Leigh successfully executed on establishing the eBooks team in Ann Arbor, integrated eBooks into PQ1, and saw growth in both eBook subscriptions and overall eBook platform usage. Outside of her product management responsibilities, Leigh has also been an active leader in our Global Women's Network.

39. Plaintiff's last day at the company was February 28, 2020.

40. Around this time, Plaintiff learned that her role as a Vice President had been filled by a male.

## COUNT I
### *Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964*

41. Plaintiff hereby incorporates all prior paragraphs as if they were set forth fully herein.

42. At all material times Plaintiff was an employee and Defendant was her employer, covered by and within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

43. Plaintiff is a member of a protected class; she is female.

44. Defendant's treatment of Plaintiff, as described above, was based, at least in part, on unlawful consideration of her sex/gender.

45. Similarly situated men were treated more favorably than Plaintiff with respect to the terms and conditions of her employment.

46. Defendant's employees, agents, and representatives were predisposed to discriminate against Plaintiff based on her sex/gender.

47. As a direct and proximate result of Defendant's unlawful conduct, as described above, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

48.     The actions of Defendant's employees, agents, and representatives were willful, intentional, and in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

49.     As a direct and proximate result of Defendant's violation of Plaintiff's rights as alleged herein, she has suffered past and future loss of earnings and earning capacity; loss of the value of benefits; she has sustained mental and emotional distress, embarrassment, humiliation, mental anguish, and anxiety; damage to her good name and reputation; and loss of the ordinary pleasures of everyday life.

## COUNT II
### Sex Discrimination in Violation of Michigan's Elliot-Larsen Civil Rights Act

50.     Plaintiff hereby incorporates all prior paragraphs as if they were set forth fully herein.

51.     At all material times Plaintiff was an employee and Defendant was her employer, covered by and within the meaning of the Elliot-Larsen Civil Rights Act, MCL § 37.2101, *et seq.*

52.     Plaintiff is a member of a protected class; she is female.

53.     Defendant's treatment of Plaintiff, as described above, was based, at least in part, on unlawful consideration of her sex/gender.

54.     Similarly situated men were treated better than Plaintiff with respect to the terms and conditions of her employment.

55.     Defendant's employees, agents, and representatives were predisposed to discriminate against Plaintiff based on her sex/gender.

56.     As a direct and proximate result of Defendant's unlawful conduct, as described above, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

57.     The actions of Defendant's employees, agents, and representatives were willful, intentional, and in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

58.     As a direct and proximate result of Defendant's violation of Plaintiff's rights as alleged herein, she has suffered past and future loss of earnings and earning capacity; loss of the value of benefits; she has sustained mental and emotional distress, embarrassment, humiliation, mental anguish, and anxiety; damage to her good name and reputation; and loss of the ordinary pleasures of everyday life.

## COUNT III
### *Retaliation in Violation of Title VII of the Civil Rights Act of 1964*

59.     Plaintiff hereby incorporates all prior paragraphs as if they were set forth fully herein.

60.     At all material times Plaintiff was an employee and Defendant was her employer, covered by and within the meaning of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

61.     Plaintiff engaged in conduct protected under Title VII including, but

not limited to, opposing and making internal complaints regarding Defendant's unlawful employment practices, which violate Title VII.

62.    Plaintiff's treatment by Defendants following her protected conduct was retaliatory and occurred, in part, because Plaintiff opposed and made complaints regarding Defendant's unlawful employment practices, in violation of the anti-retaliation provisions of Title VII.

63.    As a direct and proximate result of Defendant's unlawful conduct, as described above, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

64.    The actions of Defendant's employees, agents, and representatives were willful, intentional, and in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

65.    As a direct and proximate result of Defendant's violation of Plaintiff's rights as alleged herein, she has suffered past and future loss of earnings and earning capacity; loss of the value of benefits; she has sustained mental and emotional distress, embarrassment, humiliation, mental anguish, and anxiety; damage to her good name and reputation; and loss of the ordinary pleasures of everyday life.

## <u>COUNT IV</u>
### *Retaliation in Violation of Michigan's Elliot-Larsen Civil Rights Act*

66.    Plaintiff hereby incorporates all prior paragraphs as if they were set forth fully herein.

67.     At all material times Plaintiff was an employee and Defendant was her employer, covered by and within the meaning of the Elliot-Larsen Civil Rights Act, MCL § 37.2101, *et seq.* (the "ELCRA").

68.     Plaintiff engaged in conduct protected under the ELCRA including, but not limited to, opposing and making complaints regarding Defendant's unlawful employment practices, which violate the ELCRA.

69.     Plaintiff's treatment by Defendants following her protected conduct was retaliatory and occurred, in part, because Plaintiff opposed and made internal complaints regarding Defendant's unlawful employment practices, in violation of the anti-retaliation provisions of the ELCRA.

70.     As a direct and proximate result of Defendant's unlawful conduct, as described above, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

71.     The actions of Defendant's employees, agents, and representatives were willful, intentional, and in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

72.     As a direct and proximate result of Defendant's violation of Plaintiff's rights as alleged herein, she has suffered past and future loss of earnings and earning capacity; loss of the value of benefits; she has sustained mental and emotional distress, embarrassment, humiliation, mental anguish, and anxiety; damage to her

good name and reputation; and loss of the ordinary pleasures of everyday life.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff Leigh A. Beauchamp demands judgment against Defendant as follows:

### A.   LEGAL RELIEF

1. Compensatory, economic, and noneconomic damages in whatever amount she is found to be entitled;

2. Exemplary damages in whatever amount she is found to be entitled;

3. Punitive damages in whatever amount she is found to be entitled; and

4. An award of interest, costs and reasonable attorney fees.

### B.   EQUITABLE RELIEF

1. An order from this Court placing Plaintiff in the position she would have been in had there been no wrongdoing by Defendant, including reinstatement with back pay;

2. An injunction out of this Court prohibiting any further acts of wrongdoing;

3. An award of interest, costs and reasonable attorney fees; and

4.     Whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  November 2, 2020                    Respectfully submitted,

**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

## **JURY DEMAND**

Plaintiff Leigh A. Beauchamp, by and through her attorneys Deborah Gordon

Law, demands a trial by jury of all the issues in this cause.

Dated:  November 2, 2020                    Respectfully submitted,

**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com